## UNITED STATES DISTRICT COURT

### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| *ex rel.* SHANAY COLEMAN, and | : | |
| SHANAY COLEMAN, individually, | : | CIVIL NO. 3:05CV1207(SRU) |
| | : | |
| *Plaintiffs,* | : | |
| v. | : | |
| | : | |
| GIGLIA M. HERNANDEZ, | : | APRIL 27, 2007 |
| | : | |
| *Defendant.* | : | |

### GOVERNMENT'S SUPPLEMENTARY STATEMENT OF INTEREST

### BACKGROUND

This case involves the submission of false claims by Defendant Giglia Hernandez

to the Department of Housing and Urban Development, through the Housing Authority of

the City of Stamford ("HACS"), as administrator of the HUD Housing Choice Voucher

Program.  24 C.F.R. § 982.1 (public housing authorities generally administer the HUD

Housing Choice Voucher/Housing Assistance Program ("Housing Assistance

Program")).  In order to receive HUD payments from the HACS, Defendant certified that

she would not, amongst other things, charge more than twenty dollars a month for the

rental of an apartment unit that she owned.

Shanay Coleman, a single mother who was eligible for housing assistance

payments, rented an apartment from Defendant with the assistance of the HACS.  After

evaluating her finances, the HACS determined that Ms. Coleman could not pay more

than twenty dollars rent out of the $1,550.00 per month that the Parties agreed was

reasonable rent for Defendant's apartment.  HUD's share was $1,530.00 a month.  Six

1

times during the course of her lease with Defendant, Defendant allegedly demanded
additional cash payments of $60, which Ms. Coleman paid. Had the HACS known of
these side-payments, each one three times the amount of Ms. Coleman's monthly rent, it
would not have paid its share of the rent - $1,530.00 a month of HUD money– to
Defendant for the six months of the lease during which Defendant was overcharging
Defendant. Rather, it would have ceased payments and insisted that Defendant refrain
from charging anything more than she promised to charge in her contract with the
Government, see Exh. B to Relator's Default Affidavit (hereinafter "the contract"), or it
would have terminated Defendant's contract outright. Defendant's misrepresentations
caused HUD to pay out at least $9,180.00 that it would not have paid but for Defendants'
false statement of compliance with her contractual obligations – which is the touchstone
for damages under the False Claims Act (FCA). See United States v. TDC Management
Corp., Inc., 288 F.3d 421, 428 (D.C. Cir. 2002) ("measure of damages [is] based on what
the government would have paid out had it known of the information that [defendant]
omitted"). The Government does not dispute that the Defendant is entitled to an offset in
the amount of the value received by the Government – in this case, the $1,530.00 a month
that the Parties agreed was the Government's share of the rent.

On July 29, 2005, Relator filed her *qui tam* suit against Defendant. The
Government elected to decline intervention, and Relator served Defendant. Defendant
has since defaulted. The Relator moved for default judgment, and the Government filed a
statement of interest regarding Relator's motion. During the telephonic conference with
the Court held on Relator's motion on April 9, 2007, the Court allowed the Government

2

to provide supplemental briefing on the issues of materiality and damages. This
Supplementary Statement of Interest is limited to those two issues.

## **ARGUMENT**

As stated in part (a) of section one of the contract that Defendant signed, the purpose
of the agreement between the Parties was to provide assistance to Ms. Coleman. Contract
at ¶ 1. The Housing Assistance Program exists to aid "low-income families in obtaining
a decent place to live and of promoting economically mixed housing," and payments
made to landlords under the program are in furtherance of that purpose. 42 U.S.C. §
1437f(a); Affidavit of Robert Cappelletti, attached as Exhibit A hereto, at ¶ 4 (hereinafter
"Aff."). To be eligible for HUD payments, owners of property must submit to an
evaluation of their rental unit, and agree to charge rent in an amount determined by the
HACS. Aff. at ¶¶ 6,7. This agreement, along with an explicit promise to not overcharge,
is reflected in the landlord's contract with HUD, and serves the core purpose of the
Housing Assistance Program – to provide safe, decent, and affordable housing to low-
income families. Aff. at ¶ 4.

In this case, Defendant agreed that she would "at no time exceed the [rent determined
to be reasonable by the HACS]," and agreed that she would not be entitled to any
payments at all if she did not comply with her obligations under the contract. Contract at
¶¶ 6(a), 7(b). Defendant then allegedly demanded side-payments of three-hundred
percent of Ms. Coleman's share of the rent, every two months, for utilities that should
have been included in the total rent. The HACS would not have released payment to
Defendant had it known of the side-payments. Aff. at ¶ 5. By overcharging Ms.
Coleman, Defendant damaged Ms. Coleman in the amount of the overcharges, and

3

damaged the Government in the amount of its share of the lease payments, because the HACS would not have paid her had it known that she was violating the contract. Aff. at ¶ 5.

## I.     The HACS would not have paid Defendant had it known that she was demanding prohibited side-payments of rent from Ms. Coleman.

In order to receive payments from the HACS, Defendant had to certify that she was complying with all provisions of the contract, including the provision prohibiting any additional rental charges. Contract at ¶¶ 6(a), 7(b). In this case, Defendant certified that, unless she complied with all of the provisions of the contract, she "does not have a right to receive housing assistance payments under [the contract]"). Contract at ¶ 7(b). This agreed-upon amount of rent, $1,550.00 a month, twenty dollars of which was to be borne by Ms. Coleman, was by no means an arbitrary figure. Rather, it was arrived at after an evaluation of Defendant's property and Ms. Coleman's finances by the HACS. The purpose of the Housing Assistance Program is to aid low-income families – which was why so much effort was put into determining the correct share of rent Ms. Coleman was to pay.

The allegations in this case involve conduct central to the reason the Government entered into a contract with Defendant – to provide decent, safe, and affordable housing to Ms. Coleman. This is not a case involving mere regulatory non-compliance on issues tangential to the purpose of the contract. The Government concedes that the False Claims Act "does not encompass those instances of regulatory noncompliance that are irrelevant to the government's disbursement decisions." U.S. ex rel. Mikes v. Straus, 274 F.3d 687, 697 (2d Cir. 2001). Rather, "[a] false certification of compliance with a statute or regulation cannot serve as the basis for a qui tam action under the [False Claims

4

Act] unless payment is conditioned on that certification." Id. (citing numerous other circuit court decisions). In this case, Defendant's certification that she would follow the rules of the contract, and, more specifically, that she would not charge Ms. Coleman more than she had agreed to, was a reflection of the purpose for the Government's entering the contract, and a central condition of payment. Aff. at ¶¶ 4, 5. Stated more simply, the HACS would not have paid Defendant had it known of the overcharges, because the overcharges subvert the very purpose of the Housing Assistance Program – to provide low-cost housing to those in need. Here, the HACS determined that Ms. Coleman could afford to pay only twenty dollars a month in rental payments. Defendant's overcharges are triple that amount every two months, and they defeat the purpose of the Housing Assistance Program.

## II. The Government's damages under the False Claims Act are the amount of money that it would not have paid had it known of the false statements – in this case, the entirety of its share of the rental assistance.

The False Claims Act states that, in addition to penalties, the Government should be awarded "3 times the amount of damages which the Government sustains because of the act of [the Defendant]." 31 U.S.C. 3729(a). Courts have interpreted "the amount of damages which the Governments sustains" to be "the amount that it paid out by reason of the false statements over and above what it would have paid if the claims had been truthful." United States v. Woodbury, 359 F.2d 370, 379 (9th Cir. 1966); accord TDC, 288 F.3d at 428 ("measure of damages [is] based on what the government would have paid out had it known of the information that [defendant] omitted"); United States v. Cabrera-Diaz, 106 F. Supp.2d 234, 239 (D.P.R. 2000) (damages are "the amount the Government would not have paid had it known the true facts"); United States ex rel.

5

Roby v. Boeing Co., 79 F. Supp.2d 877, 884 (S.D. Ohio 1999) ("A court should ask the question, 'How much would the government have paid for the item at issue 'but for' the fraudulent actions of the defendant ?'").

In this case, as indicated in the language of the contract, the language of the statute, and as provided in the attached affidavit, the HACS would not have released any payment to Defendant had it known that she was violating the contract by overcharging Ms. Coleman. Rather, the HACS would have either demanded that Defendant stop accepting side-payments, or it would have voided the contract entirely. Aff. at ¶ 5. By hiding the overcharges from the Government and falsely certifying her compliance with the contract's requirements, Defendant deprived the Government of the benefit of its bargain – affordable housing for Ms. Coleman. For this reason, the Court should determine that the amount of single damages to the Government is the total amount of its outlay for each month after Defendant began demanding overpayments. As required by the False Claims Act, this amount should be trebled, then the amount of actual value received by the Government should be subtracted. 31 U.S.C. § 3729(a); United States v. Bornstein, 423 U.S. 303, 314 n.10 (1976) ("the [FCA] speaks of [multiplying] 'damages' and not [multiplying] 'net damages' or 'uncompensated damages'").[1]

## CONCLUSION

For the reasons stated above, the Court should find that the damages to the Government were the amount of its lease payments, after the first overcharge - $9,180.00. The False Claims Act requires trebling of this amount – to $27,540.00. 31 U.S.C. § 3729(a). The Government concedes that an offset of $1,530.00 per month, or $9,180.00,

---

[1] For the purposes of the valuation of a default judgment in this case, the Government concedes that it received $1,530.00 worth of value a month during the last six months of the contract from Defendant – for a total of $9,180.00 in offsets.

is appropriate, yielding a total damages award of \$18,360.00, plus penalties and

appropriate costs, for violations of the False Claims Act.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY

By:

WILLIAM A. COLLIER
ASSISTANT U.S. ATTORNEY
450 MAIN STREET, ROOM 328
HARTFORD, CT 06103
(860) 947-1101
FEDERAL BAR No. ct00986
william.collier@usdoj.gov

Dated: April 27, 2007

OF COUNSEL:

Alice A. Peterson, Esq.
U.S. Department of Housing and
  Urban Development
10 Causeway Street
Boston, MA 02222

## CERTIFICATION OF SERVICE

I certify that a true and correct copy of the foregoing was served by first-class

mail, postage prepaid, this 27th day of April, 2007, on:

Frederic S. Brody, Esq.
Connecticut Legal Services, Inc.
20 Summer Street
Stamford, CT 06901

WILLIAM A. COLLIER
ASSISTANT U.S. ATTORNEY

7

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

GOVERNMENT
EXHIBIT

CASE
NO. 3 : 05 cv 1207
(SRa)

EXHIBIT
NO.   A

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| *ex rel.* SHANAY COLEMAN, and | ) |
| | ) Civil Action No.: 3:05 CV 1207 - SRU |
| SHANAY COLEMAN, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| GIGLIA M. HERNANDEZ, | ) April 26, 2007 |
| | ) |
| Defendant | ) |

AFFIDAVIT

State of Connecticut:
: ss. Stamford
County of Fairfield :

Robert Cappelletti, being duly sworn, deposes and says:

1.     I am over the age of eighteen years and believe in the obligation of an oath.

2.     I am employed by the Housing Authority of the City of Stamford (HACS) as the

Leased Housing Coordinator.

3.   In this capacity, I am responsible for the administration of the HACS Section 8

program, including, but not limited to, compliance with all program requirements and the

authorization and release of all rental assistance checks.

4.  The purpose of the Housing Choice Voucher/Housing Assistance Program is to

provide decent, safe and sanitary housing for very low income families while maintaining their

rent payments at an affordable level.  To ensure that families pay fair and reasonable rents.  To

promote the opportunity for very low-income families to experience freedom of housing choice.

To promote the economic and social well-being of tenants[1]. As such, the requirement that owners not charge more than the agreed-upon rent to their tenants is central to the success of the program.

5. Had the HACS known that Giglia Hernandez was demanding side-payments from Shanay Coleman, it would not have released rental assistance payments to Ms. Hernandez. Had the HACS known that Ms. Hernandez was demanding side-payments from Ms. Coleman during Ms. Coleman's tenancy, it would have terminated the Housing Assistance Payment (HAP) contract with Ms. Hernandez.

6. Before entering into a HAP contract with any landlord and before the beginning of the initial lease term, HACS must inspect the unit and determine the unit satisfies the Housing Quality Standards established by HUD.

7. Prior to the beginning of the initial lease term and at least annually thereafter, HACS examines family income and composition to determine the tenant's portion of the rent. The tenant's portion of the rent is determined by first calculating the Total Tenant Payment (TTP), the amount the tenant is expected to pay for rent and utilities, which is 30% of the tenant's adjusted income (gross income less HUD allowable deductions), then subtracting from the TTP the utility allowance. The resulting amount is the tenant's portion of the rent. HACS pays the remaining portion of rent agreed upon in the HAP contract.

Signed by me on the 26th day of April 2007.

Robert Cappelatti

---

[1] Housing Authority of the City of Stamford Section 8 Administrative Plan Mission Statement

2

Subscribed and sworn to before me, the undersigned officer, on the 26th day of April 2007.

Notary Public
My Commission Expires:

**ORDETTE D. MELLAD**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES DEC. 31, 2007

3