UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SHANAY COLEMAN,
    Plaintiff,

v.

GIGLIA M. HERNANDEZ,
    Defendant.

CIVIL ACTION NO.
3:05cv1207 (SRU)

## RULING and ORDER

This case principally involves claims made pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.*, but also raises several related state law claims. This Ruling and Order resolves issues concerning the pending motion for default judgment.

    **I.**    **Background**

The plaintiff, Shanay Coleman, is eligible for rental assistance through the federal rent subsidy program, the "Housing Choice Voucher Program," or "Section 8." Complaint ¶ 1. The United States Department of Housing and Urban Development ("HUD") administers the program by entering into annual contribution contracts with local public housing agencies – here, the Housing Authority of the City of Stamford ("HACS"). Complaint ¶¶ 10-12. Coleman received housing assistance from HACS in the form of a rent subsidy, so that she could afford appropriate housing for herself and her family.

On August 8, 2003, Coleman entered into an agreement with Giglia Hernandez, the landlord of the property at issue, for the rental of the premises subject to approval by the HACS. Complaint ¶ 21. HACS approved the agreement. On August 24, 2003, Coleman and Hernandez entered into a written lease agreement, fixing Coleman's rent at $1,550 per month, and agreeing to apply Coleman's Section 8 subsidy to the rent payments in accordance with the Section 8

rules. Complaint ¶ 23. Under the Section 8 program, the HACS determined that Coleman would pay Hernandez directly $20 per month, and HACS would use HUD funding to pay Hernandez directly the balance ($1,530 per month). Complaint ¶¶ 23-30. Pursuant to the Section 8 rules, to which Hernandez agreed, Hernandez was prohibited from charging Coleman any additional payments. Complaint ¶ 35. In addition, Hernandez agreed to provide and pay for water usage. Complaint ¶ 24.

From October 2003 to August 2004, Hernandez charged Coleman an "additional rent payment" of $60.00 on six separate occasions ($360.00 total), which she claimed was for water usage. Complaint ¶¶ 31-33. Hernandez threatened to evict Coleman if she did not pay the additional sum. Complaint ¶ 32. Neither HACS, nor HUD authorized the additional payments, and the Section 8 rules prohibit such an "additional rent payment." Complaint ¶¶ 34-35. On December 4, 2004, Coleman vacated the rental property and later demanded, through counsel, the return of the "additional rent payments." Hernandez refused.

On July 29, 2005, Coleman filed a *qui tam* action pursuant to 31 U.S.C. § 3730, alleging principally that Hernandez had made false claims against the United States in violation of the False Claims Act, but also that Hernandez had: committed a discriminatory housing practice in violation of Conn. Gen. Stat. § 46a-64b *et seq.*, improperly withheld Coleman's security deposit in violation of Conn. Gen. Stat. § 47a-21, and violated the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a *et seq.* On June 1, 2006, the government filed a notice of its election to decline intervention. Coleman continued to maintain the action in the name of the United States pursuant to the False Claims Act. *See* 31 U.S.C. § 3730. On December 29, 2006, the clerk entered a default against Hernandez, pursuant to Federal Rule of

Civil Procedure 55(a). *See* doc. #18. On January 22, 2007, Coleman filed a motion for default judgment. The government subsequently filed two statements of interest concerning the amount of the judgment to be entered. *See* doc. ## 22 and 29. Coleman joined in those statements of interest. *See* doc. #28.

## II.     Standard of Review

Upon entry of a default judgment for "failure to plead or otherwise defend" against a complaint, a defendant admits every "well-pleaded allegation" of the complaint except those relating to damages. *See Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 63 (2d Cir. 1971), *rev'd on other grounds*, 409 U.S. 363 (1973); *Flaks v. Koegel*, 504 F.2d 702, 704 (2d Cir. 1974) ("While a default judgment constitutes an admission of liability, the quantum of damages remains to be established unless the amount of damages is liquidated or susceptible of mathematical computation"); *see also Time Warner Cable of New York City v. Barnes*, 13 F. Supp. 2d 543, 547 (S.D.N.Y. 1998). Accordingly, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true. *Id.*; *see also* 10A WRIGHT & MILLER, FEDERAL PRACTICE § 2688 (3d ed. 1998); Fed. R. Civ. P. 8(d).

## III.     Discussion

### A.     False Claims Act

With respect to the claims made under the False Claims Act, the principal issue is the appropriate measure of the damages sustained by the government.

Liability under the False Claims Act arises when a person "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1). A person who violates the

False Claims Act "is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . . ." 31 U.S.C. § 3729(a). In August of 1999, the Department of Justice raised the penalty range for the False Claims Act to $5,500 to $11,000. 28 C.F.R. § 85.3(9); 28 U.S.C. § 2461 (note) (empowering each federal agency to make inflationary adjustments to civil monetary penalties in the agency's jurisdiction).

Liability attaches for each false claim submitted. Thus, a defendant is subject to a civil penalty and treble damages on each false claim. *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1157 (2d Cir. 1993) (holding that "the number of assertable False Claims Act claims is not measured by the number of contracts, but rather by the number of fraudulent acts committed by the defendant") (citing *United States v. Ehrlich*, 643 F.2d 634, 638 (9th Cir. 1981) ("[I]f a person knowingly causes a specific number of false claims to be filed, he is liable for an equal number of forfeitures."). A "claim" means:

> any request or demand . . . for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(c). Here, Hernandez submitted six false claims, and thus is liable for a civil penalty and treble damages on each of the six false claims.

The question arises how to calculate the "damages which the government sustain[ed]," i.e., the proper starting point for calculating treble damages. *See* 31 U.S.C. § 3729(a). The commentary interpreting 31 U.S.C.S. § 3729 provides, "There is no simple rule for calculating

the government's damages under the False Claims Act.  The purpose of the statute is to make the government whole . . . ."  The following example is instructive: "If the defendant exaggerated the manufacturing cost of his widgets by one dollar per widget, then the government's damages are one dollar per widget." 31 U.S.C.S. § 3729 (note).  With respect to the purpose of the False Claims Act:

> The Supreme Court pointed out long ago that the chief purpose of the statutes which formed the basis for the False Claims Act was to provide for restitution to the government of the money taken from it by fraud, and that the device of double[1] damages plus a specific sum was chosen to make sure the government would be made completely whole.

*United States v. TDC Management Corp., Inc.*, 288 F.3d 421, 428 (D.C. Cir. 2002) (quotations omitted).

Similarly, the Ninth Circuit has held: "Ordinarily the measure of the government's damages under the False Claims Act would be the amount that it paid out by reason of the false statements over and above what it would have paid if the claims had been truthful."  *United States v. Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003) (citations omitted).  Here, Hernandez charged Coleman an additional rent payment of $60 on six occasions ($360 total).  Thus, by reason of the false statements (the improper demand of additional rent payments), the government, in effect, paid out an extra $60 on each of six occasions, because Hernandez was improperly obtaining that $60 from Coleman.  Had the rental subsidy claims been truthful, the government would have paid $60 less than it did on each of six occasions.  The measure of the government's damages, therefore, is $360.

The government, citing *United States v. Woodbury*, 359 F.2d 370, 379 (9th Cir. 1966),

---

[1] The statute has been amended to provide for treble damages.

argues that its measure of damages is $1,530 for each of the six false claims ($9,180 total) because, if the government had known that Hernandez was violating Section 8 rules, it would not have paid her anything. Thus, the difference between what the government paid and what it would have paid had it known that Hernandez was making false claims was $1,530, or the entire sum the government paid. That method of calculating damages has been approved by some courts in certain factual circumstances, but is not an appropriate way to measure the damages sustained by the government in this case.

The government does not dispute that it received $1,530 per month worth of value from Hernandez,[2] and that Hernandez is therefore entitled to an offset of $1,530 per month ($9,180 total). *See* Government's Supplementary Statement of Interest (doc. #29) at 2. Still, for purposes of calculating the baseline amount of damages sustained by the government (i.e., the pre-trebled damages amount), the government contends that it sustained damages of $1,530 per month for six months, resulting in damages of $9,180 before trebling. The government, citing *United States v. Bornstein*, 423 U.S. 303, 314 n.10 (1976), argues that the $9,180 should be trebled ($27,540) and then, *after trebling*, Hernandez would be entitled to an offset of $9,180, the amount of actual value received by the government. *See id.* at 6. Under that calculation, the trebled damages amount, adjusted for the offset, would be $18,360. In addition, the government is entitled to a civil penalty of $5,500-$11,000 for each of the six false claims (between $33,000 and $66,000). The government is therefore seeking a default judgment, before costs, interest, and attorneys' fees, in the amount of $51,360 to $84,360 as a result of the $360 overcharge.

---

[2] This position is puzzling. Sixty dollars of the $1,530 per month was a false claim. Thus, the value received by the government was $1,470 per month.

*Bornstein*, 423 U.S. at 314 n.10, does not discuss how to calculate baseline damages, and therefore does not advance the government's position.  In *Bornstein*, after the defendant made false claims and the government sustained damages, a third-party compensated the government for some portion of the damages.  The Court ruled that the actual damages sustained by the government, that is, the amount of the false claims, should be doubled, and *then* offset for the compensation payments the government received from the third party.  *Id.* ("We agree that the Government's damages should be doubled before any compensatory payments are deducted . . . .").  There was no issue, however, about how to calculate the actual damages sustained.  Rather, the issue in *Bornstein* was how to treat payments made by a third-party to compensate the government after the false claims had already occurred.  In contrast, the issue in this case is how to calculate the amount of damages sustained by the government in the first instance.

The Second Circuit has not specifically addressed this issue.  Based upon the specific facts in this case, namely, that the government agrees that it received substantial value from Hernandez, I find the Ninth Circuit's method of calculating the government's damages to be the appropriate method.  By reason of Hernandez's false statements, the government paid out $60 more per month than it would have paid if Hernandez's claims had been truthful, that is, if Hernandez had not been charging Coleman "additional rent payments" of $60 per month.  *See Mackby*, 339 F.3d at 1018.  The government therefore sustained damages of $360, which, when trebled, totals $1,080.  The government is also entitled to a civil penalty of $5,500 for each of the six violations, that is, $33,000.[3]  The government's total award of damages and penalties on the

---

[3] The government concedes that I have discretion to levy a penalty between $5,500 and $11,000 per violation.  In this case, a penalty of $5,500 for each of the six violations is sufficient to accomplish the purposes of the False Claims Act – that is to make the government whole and

False Claims Act claim is $34,080. Interest shall accrue from the date of entry of judgment pursuant to 18 U.S.C. § 1961.

Coleman also seeks a *qui tam* award based upon the False Claims Act claims. Pursuant to 31 U.S.C. § 3730(d)(2), if the government does not intervene in a False Claims Act suit, the court can award the *qui tam* plaintiff between 25 and 30 percent of the damages awarded to the United States. In June 2006, the government declined to intervene. *See* doc. #11. I will award Coleman 30 percent of the proceeds awarded to the United States (30 percent of $34,080), that is, $10,224. Coleman also suffered actual damages in the amount of $360 based upon Hernandez's improper demand for "additional rent payments" discussed above. Complaint ¶ 33. The sum of Coleman's damages on the False Claims Act claims is $10,584.

### B. Housing Discrimination

Coleman alleged that, on September 1, 2004, she gave Hernandez a Request for Tenancy Approval for submission to the Housing Authority of the City of Danbury ("HACD"), so that the HACD could pay Coleman's Section 8 assistance. Complaint ¶ 49. Hernandez refused, claiming that she would only deal with the staff at the HACS, not the HACD. Complaint ¶ 50. Coleman alleged, in conclusory fashion, that Hernandez's refusal is a discriminatory housing practice in violation of Conn. Gen. Stat. § 46a-64b *et seq.* Pursuant to section 46a-64c, it is unlawful:

> To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, creed, color, national origin, ancestry, sex, marital status, age, lawful source of income or familial status.

In addition, the Connecticut Supreme Court has held that, "[u]nder General Statutes § 46a-64c, a

---

to deter future false claims.

landlord may not refuse to rent to a prospective low income tenant because that tenant will pay the stipulated rent from a lawful source of income, such as rental assistance under section 8 . . . ." *Sullivan Associates*, 250 Conn. at 765.

Citing *Commission on Human Rights and Opportunities v. Sullivan Associates*, 250 Conn. 763, 765 (1999), Coleman requests that I award her damages of $10,000, because Hernandez's actions caused Coleman "to suffer great pain, hardship, humiliation, emotional distress and economic loss by reason of the defendant's discriminatory housing practice." Memorandum in Support of Claims for Damages (doc. #19) at 4. She also requests $100 moving expenses caused by Hernandez's housing discrimination.

Coleman's request for damages on her housing discrimination claim is denied. Although the complaint alleges in conclusory terms that Hernandez discriminated against Coleman, it sets forth no facts that support a claim of housing discrimination. There is no allegation that Coleman's race, creed, color, national origin, sex, or other unlawful factor motivated Hernandez's refusal to rent.

### C.      Improper Retention of Security Deposit

Coleman also requests that I award her $580, the amount of her security deposit that Hernandez wrongfully withheld from her. Coleman paid Hernandez a security deposit of $1,000. Complaint ¶ 54. When she vacated the premises in a clean, undamaged condition, Hernandez returned only $420, plus a statement accounting for charges against the security deposit. Complaint ¶ 57. Coleman has alleged that the charges are improper and that she is entitled to the return of the full amount of her security deposit. Complaint ¶¶ 31 and 58.

Pursuant to Conn. Gen. Stat. § 47a-21(g): "Any person may bring an action . . . for money

damages in any court of competent jurisdiction to reclaim any part of his security deposit which may be due." Specifically, the statute requires the landlord, upon termination of the tenant's lease, to "pay to the tenant or former tenant: (A) The amount of any security deposit that was deposited by the tenant with the . . . landlord . . . less the value of any damages which . . . [the] landlord . . . suffered as a result of such tenant's failure to comply with such tenant's obligations." Conn. Gen. Stat. § 47a-21(d).

Coleman has alleged sufficient facts to demonstrate that she is entitled to the return of the full amount of her security deposit. I therefore award Coleman $580, the amount of the security deposit improperly withheld from her.

### D. CUTPA

Coleman alleges that Hernandez's wrongful conduct violates CUTPA. Damages for CUTPA violations can include (1) actual damages, *see* Conn. Gen. Stat. §42-110g(a); (2) punitive damages, *see id.*; (3) equitable relief, *see id.*; (4) costs, *see* Conn. Gen. Stat. §42-110g(d); and (5) reasonable attorneys' fees, *see id.*

Under CUTPA, Coleman requests actual damages of $10,999, punitive damages of $9,000, and attorneys' fees. I do not find this to be a situation in which punitive damages are appropriate, principally because the False Claims Act penalties serve the purpose of punitive damages. Moreover, I decline to award any further damages under CUTPA. All actual damages requested would be duplicative of those already awarded. In addition, an award of attorneys' fees would be duplicative of the award set forth below. Thus, Coleman's request for damages under CUTPA is denied.

E.     Attorneys' Fees

Coleman seeks attorneys' fees of $18,985.[4]  Attorney Richard Tenenbaum has requested a rate of $400 per hour for the 15 hours he worked on Coleman's case.  Attorney Frederic Brody has requested a rate of $350 per hour for the 37.1 hours he worked on Coleman's case.  Legal services lawyers are entitled to be paid the same rate as attorneys in private practice.  Still, depending on the client and type of case, even experienced attorneys charge far less than the rates requested here.  In fact, to the best of my recollection, I do not recall ever awarding any attorney a rate of $400 per hour.  Moreover, it is unlikely that private attorneys in Fairfield County, Connecticut would command the rates sought here for this type of case.  Therefore, in order to reflect those factors, I am reducing Attorney Tenenbaum's rate to $300 per hour, resulting in attorneys' fees of $4,500 ($300 per hour x 15 hours), and reducing Attorney Brody's rate to $250 per hour, resulting in attorneys' fees of $9,275 ($250 per hour x 37.1 hours).  I award Coleman a total sum of $13,775 in attorneys' fees.

---

[4] In her January 19, 2007 memorandum in support of claims for damages (doc. #19), Coleman sought $15,750 in attorneys' fees, calculated at $350 per hour for 45 hours.  In subsequent attorneys' fees affidavits (doc. ## 24 and 25), Coleman updated the hours and rates sought by her counsel.

**III.     Conclusion**

Coleman's Motion for Default Judgment (**doc. # 19**) is **GRANTED**.  I award Coleman $24,939 ($10,224 for the *qui tam* False Claims Act claim and $360 return of improper "additional payments," $580 for the return of the improperly withheld security deposit, and $13,775 in attorneys' fees).  I award the United States the balance of the damages on the False Claims Act claim, that is, $23,856.  Both parties' awards shall bear interest from the date of the entry of judgment.

It is so ordered.

Dated at Bridgeport, Connecticut, this 24th day of May 2007.

/s/ Ste<u>fan R. Underhill</u>
Stefan R. Underhill
United States District Judge